# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CHRIS SCHAPIRA** and | § | |
| **PATRICIA BENITEZ** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO: 5:20-CV-01241** |
| | § | |
| **BEXAR COUNTY, TEXAS;** | § | |
| **JAVIER SALAZAR,** *Individually*; and | § | |
| **KAYA FLORES,** *Individually* | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

NOW COME Plaintiffs, Chris Schapira and Patricia Benitez, filing this their *Plaintiffs' Original Complaint*, bringing this action against Defendants, Bexar County, Texas, Javier Salazar and Kayla Flores, and asserting that Defendants, jointly and/or severally, have denied Plaintiffs their rights as guaranteed by the Constitution and/or laws of the United States of America and the State of Texas.

## JURISDICTION AND VENUE

1. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(3) (civil rights). This court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear the state claims that will be set forth in this complaint. Venue is proper in the Western District of Texas, San Antonio Division, as this is the district where the claim arose in accordance with 29 U.S.C. § 1391(b).

## PARTIES

2. Plaintiff Chris Schapira (hereinafter occasionally referred to as "Chris") is a resident of the State of Texas.

3. Plaintiff Patricia Benitez (hereinafter occasionally referred to as "Patricia") is a resident of the State of Texas.

4. Defendant Bexar County, Texas (hereinafter occasionally referred to as "Bexar County" or "County") is a political subdivision of the State of Texas, and may be served with summons upon its County Judge, Nelson W. Wolff, 100 Dolorosa, San Antonio, Texas 78205.

5. Defendant Javier Salazar (hereinafter occasionally referred to as "Salazar") was, at all times material to this suit, the elected sheriff for Bexar County. Each of the acts complained of herein arises from the conduct of Defendant while acting under color of state law and during his employment/position as the Bexar County Sheriff. Defendant can be served with summons at the BEXAR COUNTY SHERIFF'S DEPARTMENT (hereinafter occasionally referred to as "BCSD"), 200 North Comal Street, San Antonio, Texas 78207.

6. Defendant Kayla Flores (hereinafter occasionally referred to as "Flores") is an individual resident of Bexar County, Texas, and can be served with summons at her place of residence, 6400 Wurzbach Road, Apt. 1006, San Antonio, Texas 78240.

**FACTS**

7. On October 19, 2019, Patricia and Chris were walking their dogs – Curly (a chow mix) & Pugsley (a pug) – in their neighborhood as they had done a thousand or more times before. Patricia, with her arm in a cast, was holding the leash of Pugsley (the smaller of the two dogs) and Chris was holding the leash of Curly, whom had just had a cancerous mass removed from his eye, was terminally ill and in very poor health. Because of Curly's surgery and the fact that Curly was moving quite slowly, Patricia and Chris decided to cut their usual route from four blocks down to two, which led them down a street they otherwise never travelled on.

8.  As the four were travelling along the street, they came upon and passed a house with several children, a teenager and an adult outside. After passing the home without interaction or any problem, one of the girls (about three years in age) ran after Patricia and Chris, attempting to make contact with the dogs. When the little girl first went to reach for Curly, Chris – believing petting a one-eyed sick dog was not a good idea – told her no and that if she wanted, she could pet the other dog. When the little girl immediately reached for Pugsley's leash and Pugsley was trying to playfully jump up on the girl, Patricia pulled back on the leash preventing any contact from happening. At that point, Patricia (one arm in a cast and the other holding a leash) and Chris (coffee in one hand and a leash in the other) asked the little girl if she should be out there and told her she needed to go back to her house. It was then that the adult ran out in the street at the end of the drive and yelled for the little girl to "get over here."

9.  It was at this point that the adult (later determined to be the little girl's mother – Kayla Flores) started yelling at Chris and Patricia, saying they should have said something to her. In response, and in an effort to explain that they were trying to do just that, Chris told Flores they were just walking their dogs when her child approached them, that they were in the process of telling the child to return to the home when she (mom) walked outside and that she needed not be angry with them and should instead go back to her house with her daughter.

10. During this time and thereafter, Flores continually cursed – not out of fear but out of anger at them telling her what to do. When Chris and Patricia kept telling Flores to just leave and go back to her daughter, Flores continued her rant, calling Patricia a bitch and telling Patricia she was going to "f**k her up" and "break her other arm." At this point, Patria told Flores "to go ahead" and that she "hears jail" in Flores' future. After some other spirited conversation and a few insults between everyone, Flores said "what did you say . . . ok then" as if to concede a point

3

and left to call the police to make another. At no point did anyone discuss anything concerning anything other than the fact that the unsupervised child had approached the dogs on her own and without an invitation all because Flores was not watching her child – and that is what angered Flores.

11. At about that same moment, Chris and Patricia determined that Flores was not going to stop her rant and just decided to let it go and move on their way. After that, Chris and Patricia continued their walk, returned home to eat their breakfast which had been baking while they were on the walk and discussed the crazy encounter with their son, with never a thought concerning anything involving the police or otherwise. Thereafter, Patricia left home to do some errands and Chris remained at the house.

12. A few hours later, it was again time to walk Curly (the medications caused him to urinate quite frequently). As he exited his home, Chris could see a large group of officers speaking to one of his neighbors down the street. Wanting to find out if everything was okay, Chris walked toward the officers. As he reached near them, the officers asked if he was Chris and if his wife had a cast. After answering yes, the officers pulled their guns out, trained them on Chris and took him into custody – in full view of the neighborhood and in the presence of the media, which were already on location.

13. A short bit later when Patricia returned to the house, she too saw the commotion and thinking it might be a neighbor with lung cancer (and certainly not anything concerning her family), continued down the street (about five houses) to pick up her grandson to go swimming. That was when an SUV pulled in behind her and the officer asked if she was in a hurry to get somewhere. At that point, Patricia was placed under arrest and driven back up to her house. Now, with both Chris and Patricia in custody, officers searched (without a warrant, consent or

otherwise) their home – of course, nothing was found.

14.     Thereafter, Chris and Patricia were charged with "attempted kidnapping" and transported to the Bexar County Detention Center (hereinafter occasionally referred to as "BCDC"), where they were – in a very loud fashion so as to apprise every one of their charge – assured by guards at the BCDC that there were "no three-year-olds here," were asked if "they have kids – what did the pair do" and were told that "people who mess with kids are the worst." Chris and Patricia remained in custody for the next several days, during which time, Flores and the BCSD ferociously attacked Plaintiffs in the media, news and social outlets. In particular, Salazar (who was facing an upcoming election) posted about Plaintiffs, their arrest, their mugshots (next to a picture of Salazar's badge), the existence of video (that never existed) and commenting that "[t]his was such a brazen daylight attempt to kidnap a three-year old girl that I just have to think as a career police officer this can't be the first time something suspicious like this has happened with these folks."

15.     Thereafter Salazar posted – either through his family, his personal media and/or the BCSD – numerous recounts of the events and allowed (even after numerous requests to remove the content), ratified and condoned others to contribute to his posts as well. In short, Salazar's posts were shared over 1,800 times, with over 28 people wishing death upon Chris and Patricia and countless other concerns/comments, among countless others, directed to them as follows:

- "I hope they searched their home in case they had other children locked up in there"
- "The question now is to figure out how many times they've done this before"
- "There is no reason to let these people back in the streets attempting to kidnap a child should be a life sentence offense"
- "They would be leaving in body bags and not cuffs if they were my children they approached"
- "Scary to think what their motive was. Thank God they were able to stop them. I wonder if they had done this before?"
- "coyotes would be eating good tonight"
- "throats would be cut and left in the woods"

- "rain fire over them"
- "boiled in oil"
- "22 long rifle to the back of the head"
- "leaving in body bags"
- "Please DO accidentally release them - just saying"
- "hang them by the tree"
- "firing squad"
- "shove them underneath the jail for good"
- "no jury.  straight to the chair"
- "blow their brains out"
- "lady would have more than a broken arm"
- "public hanging"
- "waterboard them"
- "they will probably get out" or "they will probably get off" and that "they will probably do it again"
- "I can tell these two are part of something big"
- numerous postings of their address for the above purposes

16. As a result of the relentless barrage of insults, attacks and outright threats – all under the umbrella and protection of Salazar – Chris and Patricia were, *inter alia*, forced to live in motels for months, sell their home and eventually relocate to another city to try and salvage their lives and their businesses.

17. Immediately after their initial arrest, Chris and Patricia took and passed polygraphs.

18. In May of 2020, all criminal charges against Chris and Patricia were "no billed. Shortly thereafter (if not the same day), Salazar was quoted as follows:

> "I still firmly believe that what occurred that day is disturbing. What the grand jury ultimately decided cannot change what transpired. Had the mother of that little girl not looked up in time and confronted these two people, there's no way to know what would have happened."

### FIRST CLAIM FOR RELIEF - §1983
### VERSUS DEFENDANT COUNTY and DEFENDANT SALAZAR

19. The Civil Rights Act of 1871 (Ku Klux Klan Act), now codified as 42 U.S.C. § 1983 as federal law provides: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be

6

subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

20. The state action requirement for standing under 42 U.S.C. § 1983 has more commonly been referred to as "color of state law," from the statute itself.  Plaintiffs are informed and believe, and thereupon allege that in committing said acts and/or omissions, Defendant County and/or Defendant Salazar were the agent and employee of each other and were acting within such agency and employment and that each Defendant was acting under color of state law.

21. 42 U.S.C. § 1983 requires that the conduct complained of must have deprived the person of some privilege or immunity secured by the Constitution or laws of the United States.  As such, Plaintiffs allege that Defendants, jointly and/or severally deprived them of the following:

   a) their Fourth Amendment right to be secure against unreasonable searches and seizures;

   b) their Fourth Amendment right to the necessity of probable cause and/or warrant prior to an arrest;

   c) their Fourteenth Amendment right to due process;

   d) their Sixth Amendment right to a fair trial;

   e) their Eighth Amendment right to not have cruel and unusual punishment inflicted upon them; and

   f) their "substantive due process" right secured by the Fourteenth Amendment.

22. It is also well-established that "municipalities" (such term includes counties) are liable under 42 U.S.C. § 1983 for constitutional torts that are in-compliance with the municipality's customs, practices, policies or procedures.  A municipality is liable for constitutional deprivations visited pursuant to governmental custom even though such custom has not received

formal approval through the body's official decision-making channels.  In this case, and apart from any direct violations stemming from Defendant Salazar's own actions, Defendant County is liable for the actions of its employee/agents because it sanctioned the custom, practice and/or policy or procedure of illegal searches, illegal seizures, and/or violating their citizens' rights, such were a customary practice and/or policy or procedure that was sanctioned by Defendant County and/or Defendant County failed to train its employees/agents as to the those above-noted rights concerning searches and arrests.

### SECOND CLAIM FOR RELIEF (ALTERNATIVE) - Texas - DEFAMATION/SLANDER VERSUS DEFENDANT SALAZAR (*individually*)[1]

23. Statements made by Defendant Salazar constitute defamation/slander and/or defamation/slander *per se* because they tended to injured Counter-Plaintiffs' reputations and expose them to public hatred, contempt, ridicule, and financial injury, and impeached their honesty and integrity.  The defamatory statements set forth above are false. The false and defamatory statements set forth above were made (and/or adopted and/or by republished) by Defendant Salazar, who negligently or intentionally failed to ascertain the truth. Defendant Salazar either knew or should have known in the exercise of ordinary care that the statements were false. Defendant Salazar published the defamatory statements to a third-party. All of the persons who heard or read the defamatory statements understood that they referred to Plaintiffs. Defendant Salazar published the defamatory statements with knowledge that they were false or with substantial grounds for knowing that they might be false and with reckless disregard to whether they were true or false. Defendant Salazar was acting with malice when he made each of the statements about Plaintiffs.

---

[1] This "alternative" claim is being alleged in the event the Court and/or trier of fact determines that Defendant Salazar was not acting in any in an official capacity.

### THIRD CLAIM FOR RELIEF - Texas - Malicious Prosecution
### VERUS DEFENDANT FLORES

24. As a pendent state cause of action, at all times material and relevant herein, Defendant Flores, by acts and/or omissions and under color of state law, instituted criminal proceedings against Plaintiffs with malice. Hence, Plaintiffs also plead a cause of action for malicious prosecution under state law of Texas and said claim is set forth above.

### DAMAGES

25. As a result of the foregoing unlawful and wrongful acts of Defendants, jointly and severally, Plaintiffs have been caused to suffer general damages which include but are not limited to the following: both physical and emotional injury, including but not limited to - - pain and suffering, emotional and mental distress, and personal humiliation and shock.

26. Said injuries have caused Plaintiffs to incur special damages which include, but are not limited to: loss of income, the occurrence of attorneys' fees associated with criminal charges, costs of moving and the loss in the sale of their home.

27. Pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, a prevailing party in a § 1983 case is entitled to recover his attorney's fees. Hence, Plaintiffs further pray for all costs and attorney fees associated with bringing the present case to trial.

28. In addition, Plaintiffs pray for punitive damages against all individual Defendants. Punitive damages are designed to punish and deter persons such as Defendants who have engaged in egregious wrongdoing. Punitive damages may be assessed under § 1983 when a Defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally-protected rights of others. While municipal defendants are absolutely immune from § 1983 awards of punitive damages, such damages may be awarded against a public employee or official in their individual capacity. Therefore,

Plaintiffs allege and pray for punitive damages against all individual Defendants, as such Defendants actually knew that their conduct was unconstitutional, and/or was callously indifferent to its legality.

**WHEREFORE PREMISES CONSIDERED**, Plaintiffs pray that upon trial of the merits, they recover compensatory damages against Defendants, jointly and severally; that they also recover punitive damages against the individual Defendants in an amount to punish and/or deter and to make an example of those Defendants in order to prevent similar future conduct; and, that they recover against each Defendant all reasonable and necessary attorney's fees, court costs and expenses in regards to the present suit in litigation. Moreover, Plaintiffs pray for all pre-judgement and post judgement interest that can be assessed against the Defendants in the event of recovery; and that they recover against each Defendant any and all other general or specific relief to which they prove themselves justly entitled.

Respectfully submitted,

GALE LAW GROUP, PLLC
711 N. Carancahua St., Suite 514
Corpus Christi, Texas 78401
Mailing Address:
P.O. Box 2591
Corpus Christi, Texas 78403
Phone Number: 361-808-4444
Fax Number: 361-232-4139

By: */s/ Christopher J. Gale*
Christopher J. Gale
Texas Bar No. 00793766
Email: Chris@GaleLawGroup.com
*Attorney-in-Charge for Plaintiffs*

### Demand for Jury Trial

Plaintiffs hereby demand trial by jury pursuant to Fed.R.Civ.P. 38(b).